UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 16-cv-23020-SCOLA

JUAN CARLOS GIL,

      Plaintiff,

v.

WINN-DIXIE STORES, INC.,

      Defendant.

_____/

**PLAINTIFF, JUAN CARLOS GIL'S PROPOSED FINDINGS OF FACT**
**<u>AND CONCLUSIONS OF LAW</u>**

      Plaintiff, JUAN CARLOS GIL, by and through undersigned counsel and pursuant to the Court's August 31, 2016 Scheduling Order and Order of Referral to Mediation [ECF No. 10], Fed. R. Civ. P. 52(a), and S.D. Fla. L.R. 16.1(k), hereby submits this Proposed Findings of Fact and Conclusions of Law, and states as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS CAUSE came before the Court for a bench trial during the two-week trial period beginning on April 17, 2017. Having heard the testimony and reviewed the exhibits, pursuant to Fed. R. Civ. P. 52(a)(1) the Court makes the following findings of fact and conclusions of law:

## I.   FINDINGS OF FACT

**A.   Background.**

1.      Plaintiff, Juan Carlos Gil ("Gil" or "Plaintiff"), filed the instant matter against Winn-Dixie Stores, Inc. ("Winn-Dixie"), pursuant to the Americans with Disabilities Act of 1990, as amended 42 U.S.C. §§ 12101, et seq. ("ADA"), on the grounds that Winn-Dixie discriminated against him in the full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations provided by and through Winn-Dixie's website, https://www.winndixie.com, (the "Website"). [*See* Compl., ECF No. 1].

2.      Gil is legally blind and suffers from a learning disability.

3.      Gil is an individual with a disability within the meaning of the ADA. [*See* Pre-Trial Stip. § V at ¶ A, ECF No. 34].  Specifically, Gil has a "qualified disability" under the ADA, which prevents him from accurately visualizing his surroundings, adequately traversing obstacles and walking without assistance. [Compl. ¶ 12, ECF No. 1]. Thus, Gil is substantially limited in performing one or more major life activities. [*Id.* ¶ 12].

4.      Winn-Dixie is the owner and operator of a regional chain of grocery stores, some of which contain pharmacies, in the Southeastern United States. [*Id.* ¶¶ 13-14; *see also* Pre-Trial Stip. § V at ¶ B, ECF No. 34].

5.      Winn-Dixie grocery stores offer for sale to the general public grocery items including, but not limited to: meat, vegetables, dry goods, dairy products, bakery goods,

magazines, gift cards, packaged ready-to-eat meals and snacks, and full service pharmacies. [Compl. ¶ 4, ECF No. 1].

6.      Winn-Dixie owns and/or operates 513 grocery and pharmacy stores in Florida, Alabama, Louisiana, Georgia and Mississippi. Winn-Dixie also offers brand grocery/deli items (under the Winn Dixie brands: Winn Dixie, and also Chek, Clear Value, Fisherman's Wharf, Kuddles, Prestige, Top Care, La Baguetterie, and Lip Lickin Chicken). [*Id.* ¶ 18].

7.      Winn-Dixie operates the Website, which enables members of the general public to locate Winn-Dixie's physical stores, fill/re-fill prescription medications for in-store pick up, and obtain information, cooking recipes and tips regarding products sold at Winn-Dixie's physical stores. [*Id.* ¶¶ 19, 21].

8.      The Website is offered to provide the general public information including but not limited to information on the various locations of the Defendant's Winn Dixie stores. [*Id.* ¶ 17].

9.      The current version of Winn-Dixie's website was launched in September 2015. [*See* Pre-Trial Stip. § V at ¶ E, ECF No. 34].

10.      The Website is directly connected to its Winn-Dixie grocery and pharmacy stores since the Website provides a site locator to the Winn-Dixie grocery and pharmacy store locations (places of public accommodation). Thus, the Website has a true nexus to the Defendant's Winn Dixie grocery and pharmacy stores. [*Id.* ¶ 5].

11.      Since the Website allows the general public the ability to locate one of the many Winn-Dixie grocery store/pharmacy locations, the Website is an extension of the physical Winn Dixie grocery stores and on-site pharmacies. Therefore, the Website has a direct nexus between the Website and the physical grocery stores and on-site pharmacies, hence the Website is also characterized as a place of public accommodation; 42 U.S.C. §§s 12181(7)(E) and (F). [*Id.* ¶ 20].

12.     The Website also allows the general public access to fill-refill pharmacy prescriptions for in-store pick up or delivery. As such, the Website is a sales establishment, which is a public accommodation pursuant to 42 U.S.C. § 12181(7)(F) and must comply with the ADA. As such, Winn-Dixie has subjected itself and the Website it has created and maintains, to the ADA. [*Id.* ¶ 21].

13.     Only *some* of the physical Winn-Dixie grocery stores have a pharmacy store. [Pre-Trial Stip. § V at ¶ B, ECF No. 34].  Information concerning each store location is provided on the Website. [*Id.* ¶ F].

14.     Gil is a customer of Winn Dixie grocery and pharmacy stores and is interested in filling/refilling pharmacy prescriptions on-line, as offered through the Website. [Compl. ¶ 22, ECF No. 1].

15.     Gil frequently utilizes the internet. In order to comprehend information available on the internet and access/comprehend websites, he uses commercially available screen reader software to interface with the various websites. [*Id.* ¶ 23].

16.     Gil utilizes the Job Access With Speech screen reader software ("JAWS"). JAWS is a computer screen reader program for Microsoft Windows that allows blind and visually impaired users to read the screen either with a text-to-speech output or by a refreshable Braille display. The JAWS Scripting Language allows the user to use programs without standard Windows controls. JAWS is the most popular screen reader software utilized worldwide because it allows individuals who are visually impaired to comprehend information available on the internet and access websites. [*Id.* ¶ 27].

17.     In order to attempt to comprehend, view and interact with the Website, and to become informed of the Winn-Dixie brand grocery/deli items and pharmacy (which other able-

4

bodied members of the general public are able to access online), Gil must use screen reader software. [*Id.* ¶ 25].

18.    Filling and refilling drug prescriptions online and having those items ready for pick up or delivered to one's home is a highly sought after accommodation that helps improve the lives of visually impaired persons such as the Plaintiff (and thousands of others like him), and helps them integrate and participate in society. [*Id.*].

19.    Plaintiff has been a customer of Winn-Dixie, and is interested in continuing to be a customer at Winn-Dixie grocery stores and pharmacies.

20.    Gil had learned about the Winn-Dixie on-line pharmacy services and Website and decided to attempt to view same online to learn more about the Winn-Dixie brand items, store locations and to avail himself of the goods and services provided by the Website, including but not limited to utilizing online pharmacy services through the Website. [*Id.* ¶ 26].

21.    During June and July 2016, the Plaintiff attempted on several occasions to utilize the Website to avail himself of the Winn Dixie brands and Winn Dixie on-line pharmacy.

22.    Gil is a customer of Winn-Dixie's grocery and pharmacy stores and desires to re-fill his pharmacy prescriptions through the Website's online prescription re-fill service and obtain information regarding Winn-Dixie's in-store products. [*Id.* ¶¶22, 27].

23.    Gil desires to avail himself of online coupons available on the Website, and to have those coupons applied to rewards account.

24.    Gil attempted to locate an Accessibility Notice or other information relating to the Website's future accessibility plans or the appropriate contact to provide Winn-Dixie with notice of the Website's inaccessibility, but the Website did not contain any Accessibility Notice or other information. [*Id.* ¶ 29].

25.     Gil desires to use the Website in the immediate future. [*Id.* ¶ 31]. However, the Website's inaccessibility prohibits Gil from using its services as experienced by the general public. [*Id.* ¶ 32].

26.     Winn-Dixie completely excludes individuals with disabilities who are visually impaired from enjoying and visiting their place of public accommodation, namely, the Website. [*Id.* ¶ 3].

27.     The Website pharmacy functionality provides users with a "sign-in" process and confirmation of the user's identity. [Cornwell Depo. Tr. 45:3-12]. The user's prescription information, including all history of past fill/refill information, is displayed on the Website. [*Id.*].

28.     Winn-Dixie's current Website does not integrate with screen reader software or meet the Web Content Accessibility Guidelines ("WCAG") 2.0 Basic Level of web accessibility. [Pre-Trial Stip. § V at ¶ H, ECF No. 34].

29.     Winn-Dixie's Website permits patrons to access a third-party website by which customers can manage and refill their pharmacy prescriptions for pick up in the store. [*Id.* § V at ¶ G].

30.     The Website does not include the universal symbol for the disabled, which would permit the disabled individual to access the website's accessibility information and accessibility facts. [Compl. ¶ 73, ECF No. 1].

31.     The Website is not compatible with any commercially available screen-reader software, which would enable a blind individual to access the Website. [Compl. ¶ 33, ECF No. 1].

32.     The Website is not compatible with JAWS.

33.     Gil was unable to avail himself of the goods and services provided by Defendant through its Website.

34.     The Website is inaccessible to visually impaired persons, including Gil.

35.     Winn-Dixie does not utilize any web accessibility testing programs and never took steps to evaluate or conduct testing on accessibility of the Website. [Cornwell Depo. Tr. 21:17-19; 34:12-22].

**B.     Expert Testimony.**

36.     The testimony of Chris Keroack confirmed that the Website is not equally accessible to persons that are blind or have significant vision loss.

37.     Mr. Keroack has more than 23 years' experience working in in the information technology industry, most particularly in testing and evaluating the accessibility of internet websites. Mr. Keroack currently works as an Accessibility Consultant for Equal Entry LLC, a consultant firm that provides advice and consultation to businesses for purposes of achieving compliance with the ADA.

38.     The Court finds Mr. Keroack to be qualified as an expert to render his expert opinions in this case.

39.     Gil called Mr. Keroack to testify as to industry standards, best practices, requirements for websites to be accessible to the disabled, including the visually impaired, the Website's inaccessibility for Gil, and the manner in which the Website should have been brought in to compliance with the ADA and could be brought in to compliance with the ADA.

40.     Winn-Dixie did not disclose or present any expert or rebuttal expert testimony.

41.     After a high level audit of the Website, Mr. Keroack determined that the Website is not equally accessible to persons that are blind or visually impaired. [*See* Keroack Report at P-1, pp.1-2].

42.     Mr. Keroack opined that the following are the most significant accessibility problems present on the Website:

a.     Keyboard accessibility is not thoroughly available on the Website. Some items in the tab order are not visible but still receive focus, such as menu items and filter pane options, and other essential items do not receive focus at all.

b.     Timed items (such as carousel control) cannot be paused by users of assistive technology who may need additional time to read and understand the content; and

c.     A variety of user controls (such as buttons and checkboxes) are not labeled programmatically and without programmatic description, an assistive technology such as screen reader software will not be able to describe these elements. [*See id.*]

43.     At trial, Mr. Keroack opined that under the WCAG 2.0 Basic Level Guidelines[1], Winn-Dixie's Website falls short in a number of critical respects, confirming the difficulties Plaintiff had in accessing the Website. [*See generally* Keroack Report at P-1].

44.     Among other things: 1) on the Pharmacy Account page, a keyboard-only user will not be able to interact with the list to expand and collapse the sections, a mouse or other pointing device is required; 2) throughout the site, when using the Tab key to navigate, the "Log In" and

---

[1] The WCAG 2.0 Basic Level Guidelines are published by W3C, which is the main international standards organization for the World Wide Web and has been widely adopted as an appropriate measure to evaluate and ensure the accessibility of commercial websites for visually-impaired disabled persons by the United States Department of Justice ("DOJ") and by courts in connection with consent decrees for ADA actions based on inaccessible websites. *See National Federation of the Blind, et al. v. HRB Digital LLC, et al.*, No. 1:13-cv-10799-GAO [ECF #60 at 5] (D. Mass. Mar. 24, 2014); *See also* a settlement agreement with Internet www.peapod.com dated November 17, 2014 and available at: https://www.justice.gov/opa/pr/justice-department-enters-settlement-agreement-peapod-ensure-peapod-grocery-delivery-website.

"Sign Up" links are not in the Tab order, so the keyboard user moves from the logo link to the search edit, skipping over those two links; 3) the ad carousel in the middle of the top-third of the page does not pause when a keyboard user navigates it; 4) on the main page, if you are using a screen reader, all links sound the same—they are all announced as "Learn More; and 5) on the main page, directions under the locator control are not described to the user, the text for the locator control is hard to interpret, and the buttons next to each edit control are not programmatically labeled. [*Id.*]. Each of these accessibility issues are detailed in the "Winn Dixie – Accessibility Issue List" spreadsheet prepared by Plaintiff's expert. [*See id.*].

45.     Based on the testimony of Mr. Keroack, remediation measures to correct the Website's significant block issues in many WCAG 2.0 categories is necessary to afford equal access to the Website. [*Id.*].The Court finds the conclusions of this expert to be credible and persuasive. The Court notes that Winn-Dixie did not call a single ADA expert or compliance specialist to offer contrary testimony.

## II.     CONCLUSIONS OF LAW[2]

### A.     The Applicable Law: Title III.

The ADA is a remedial statute that is construed liberally to "effectuate its *sweeping* purpose to forbid discrimination against disabled individuals in major areas of public life." *Mary Jo C. v. N.Y. State & Local Ret. Sys.,* 707 F.3d 144, 160 (2d Cir. 2013) (emphasis added). Access to information and the social and economic opportunities that flow therefrom is one of the major areas of public life the ADA sought to open for persons with disabilities. *Authors Guild, Inc. v. HathiTrust*, 755 F. 3d 87, 102 (2d Cir. 2014) (42 U.S.C. § 12101(a)(7)).

---

[2] To the extent the Court's factual findings constitute legal conclusions, they are incorporated into these conclusions of law. To the extent that there are any additional findings of fact in this section, they shall have the same effect as if listed in the findings of fact above.

Title III of the ADA prohibits the owner of a place of public accommodation from discriminating "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. . ." 42 U.S.C. § 12182(a). The ADA defines a public accommodation as a private entity whose operations affect commerce, and which falls within one of the following twelve (12) categories:

(A)  an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

(B)  a restaurant, bar, or other establishment serving food or drink;

(C)  a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D)  an auditorium, convention center, lecture hall, or other place of public gathering;

(E)  a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F)  a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G)  a terminal, depot, or other station used for specified public transportation;

(H)  a museum, library, gallery, or other place of public display or collection;

(I)  a park, zoo, amusement park, or other place of recreation;

(J)  a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K)  a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L)  a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181.

The Attorney General has promulgated regulations that further define a public accommodation as "a facility operated by a private entity, whose operations affect commerce and

fall within at least one of [42 U.S.C. § 12181(7)'s twelve categories]." 28 C.F.R. § 36.104. The regulation defines "facility" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." *Id.*

As with the rest of the ADA, the statute's legislative history indicates this list of public accommodations "*should be construed liberally"* to afford people with disabilities equal access to the wide variety of establishments available to the non-disabled. *PGA Tour, Inc., v. Martin*, 532 U.S. 661, 676-77 (2001) (expanding the ADA to hold that golf courses, including play areas are places of public accommodation during professional tournaments) (emphasis added).

**B.    Preliminary Matters: Jurisdiction, the Parties, Standing, and the Applicability of Title III.**

  **i.       <u>Jurisdiction.</u>**

The Parties stipulate the basis of federal jurisdiction in this matter arises under 28 U.S.C. § 1331 and Title III of the Americans With Disabilities Act, 42 U.S.C. §§ 12181-12189.  [Pre-Trial Stip. § II, ECF No. 34].

  **ii.      <u>Standing Under Article III of the United States Constitution.</u>**

A plaintiff alleging Title III ADA discrimination must initially prove that (1) he is a disabled individual; (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against the plaintiff within the meaning of the ADA. 42 U.S.C. § 12182(a).

A plaintiff must demonstrate three things to establish standing under Article III.[3] ***First***, he must show that he has suffered an "injury-in-fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). ***Second***, the plaintiff must demonstrate a causal connection between the asserted injury-in-fact and the challenged action of the defendant. *Id.* at 560. ***Third***, the plaintiff must show that "the injury will be redressed by a favorable decision." *Id.* at 561 (citations and internal quotations omitted). These requirements are the "'irreducible minimum' required by the Constitution" for a plaintiff to proceed in federal court. *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 664 (1993) (citation omitted). In addition, "because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges…a real and immediate-as opposed to a merely conjectural or hypothetical-threat of future injury." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001).

With this standard in mind, the Court finds that Gil has standing.

    a.    **Injury-In-Fact.**

The "injury-in-fact" demanded by Article III requires an additional showing when injunctive relief is sought. In addition to past injury, a plaintiff seeking injunctive relief "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001). Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party shows "a real and immediate—as opposed to a merely conjectural or hypothetical—

---

[3]     The parties do not dispute whether Plaintiff is disabled. Under the ADA, a disability is defined three ways: "(1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C).

threat of future injury." *Shotz*, 256 F.3d at 1081; *Wooden*, 247 F.3d at 1284 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 1665, 75 L. Ed. 2d 675 (1983)).

The evidence adduced at trial demonstrates Gil has an injury-in-fact, given that, as a disabled individual, he was discriminated against by Winn-Dixie when he attempted to access and use the Website, and he faced numerous barriers to accessibility.

### b.    Causation.

To establish Article III standing, Gil also must demonstrate a causal connection between his injury and Winn-Dixie's conduct. *Lujan,* 504 U.S. at 560-61. The testimony of Gil supports the Court's finding that a causal connection exists between this injury-in-fact and the action of Winn-Dixie. At trial, Gil testified that the Website's accessibility barriers restricted and will continue to restrict his ability to the full and equal enjoyment of the Website. *See Lugo v. 141 Nw 20th St. Holdings, LLC*, 878 F. Supp. 2d 1291, 1295 (S.D. Fla. 2012).

### c.    Redressability.

The third prong of an Article III standing analysis considers whether it is likely that the plaintiff's injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560. At trial, Gil testified that the Website is not accessible and thus he has been discriminated against, is without an adequate remedy at law, is suffering irreparable harm and will continue to do so unless the barriers are removed. Because Gil's relief depends on action by Winn-Dixie to remediate, a favorable decision by the Court is likely to redress Gil's injury.

Accordingly, the Court finds that Gil has satisfied his burden of demonstrating Article III standing.

### iii.    <u>The Website Must Comply with Title III of the ADA.</u>

The Website must comply with Title III.  Gil is a qualified individual with a disability for purposes of Title III, and has standing to maintain his claim for the alleged discrimination he incurred while trying to access the Website. Winn-Dixie is a grocery and pharmacy store chain that operates the Website, which allows consumers to locate physical Winn-Dixie store locations, fill and refill prescriptions for in-store pick-up delivery, learn about Winn-Dixie brand items, access home-cooking recipes, and receive information about product recalls. Thus, Winn-Dixie is subject to liability under Title III.  *See* 42 U.S.C. § 12182(a).

Winn-Dixie admits that its physical grocery stores and pharmacies are places of public accommodation. [Answer ¶ 16, ECF No. 7]. However, Winn- Dixie disputes that its Website qualifies as a public accommodation under the ADA. The Plaintiff asserts that Winn-Dixie's Website is subject to Title III of the ADA for two reasons. First, the Plaintiff asserts that Winn-Dixie's Website is a public accommodation in and of itself because it allows customers to fill or re-fill prescriptions for in-store pick up or for delivery. [Compl. ¶ 21, ECF No. 1]. Therefore, Plaintiff asserts that this service makes Winn-Dixie's website a sales establishment, which is an enumerated public accommodation pursuant to the ADA. [*Id.*]. Second, Plaintiff asserts that the Website is "directly connected" to the physical stores and has a "true nexus" to Winn-Dixie's grocery and pharmacy stores. [*Id.* ¶¶ 5, 20.]. In furtherance of this assertion, the Plaintiff alleges that the Website "augments" Winn-Dixie's physical store locations by assisting customers in finding physical store locations, educating the public as to the line of Winn-Dixie brand grocery items as well as other grocery items, and providing the public with the ability to fill and re-fill prescriptions from its pharmacy for in-store pick-up and delivery. (*Id.* ¶ 67.)

1.    ___The Website Is a Public Accommodation Under Title III of the ADA.___

The Court finds the ADA applies to the Website, a place of public accommodation, for the following reasons: (1) the statutory construction of the ADA demonstrates its applicability is not limited to physical "brick and mortar" locations; (2) Congress' intent was for the ADA to be responsive to changes in technology; and (3) the Department of Justice has interpreted the ADA to apply to websites.

### a. The Statutory Construction of The ADA Demonstrates Its Applicability Is Not Limited to Physical "Brick and Mortar" Locations.

Winn-Dixie maintains that the ADA only applies to physical locations, relying upon *Access Now v. Sw. Airlines*, 227 F. Supp. 2d 1312, 1314 (S.D. Fla. 2002). *Access Now* appears to be the only decision within the Eleventh Circuit[4] to address the issue of whether the ADA applies to a website.[5] *Access Now* is distinguishable from the instant case, and was decided during a time period in which e-commerce was in its infancy.

In *Access Now*, the plaintiff filed a lawsuit against Southwest Airlines alleging its website, Southwest.com, violated the ADA because it was inaccessible to blind persons using a screen reader. *Id.* at 1316. The plaintiff alleged the website denied equal access to Southwest Airline's "virtual ticket counters as they exist on-line," which enabled members of the general public to book flights through the defendant's website. *Id.* at 1321. The plaintiff argued

---

[4] Winn-Dixie acknowledges the Eleventh Circuit has not yet ruled on whether a website is a place of public accommodation under the ADA. [ECF No. 15, p. 4]. In *Access Now, Inc. v. Southwest Airlines, Co.,* 385 F.3d 1324, 1328-29 (11th Cir. 2004), the Eleventh Circuit dismissed the plaintiff's appeal because the plaintiff presented a new theory of liability that the district court did not have an opportunity to consider, namely, that Southwest Airlines as a whole is a place of public accommodation because it operates a travel service. The Eleventh Circuit in that opinion did not ultimately decide the issue of whether a website is a place of public accommodation under the ADA.

[5] In *Gomez v. Lindeberg USA, LLC,* 16-22966-CIV-WILLIAMS (S.D. Fla. 2016) the plaintiff alleged defendant's website violated Title III of the ADA because it was inaccessible to the blind. [D.E. 1]. The Defendant did not answer the Complaint, and the district court entered a default judgment, which required the defendant to immediately undertake remedial measures to make its website, www.jlindebergusa.com compliant with the ADA and accessible to people with visual disabilities. [D.E. 23, ¶ 3].

Southwest.com was a "place of public accommodation" because it qualified as an "exhibition," "display," and "sales establishment." *Id.* at 1318.

In granting Southwest Airline's Rule 12(b)(6) motion to dismiss, the district court first determined Southwest.com was not a "place of public accommodation" as defined by the plain language of the ADA. *Id.* at 1317. The court applied the doctrine of *ejusdem generis*, which states "where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." *Id.* at 1318. In applying this rule, the court held the general terms of the ADA relied upon by the plaintiff: "exhibition," "display," and "sales establishment," were limited to their "corresponding specifically enumerated terms" all of which were concrete structures such as "museum," "library" and "bakery." *Id.* at 1319. Thus, the court declared Southwest.com was not a public place of accommodation because the ADA's language did not expressly enumerate "virtual spaces" as protected by the statute. *Id.*

Since the fourteen (14) year old decision in *Access Now*, other district courts throughout the country have ruled to the contrary and have been critical of *Access Now's* interpretation of the ADA and its application to websites. Courts have more recently held websites are places of public accommodation - regardless of whether the website has a connection with a physical structure.

For example, in *Nat'l Ass'n of the Deaf v. Netflix, Inc.,* 869 F. Supp. 2d 196, 199 (D. Mass. 2012) the plaintiff sued Netflix, Inc., ("Netflix") under Title III of the ADA based on Netflix's failure to provide equal access to its video streaming website "Watch Instantly" for deaf and hearing impaired individuals. There, the plaintiff alleged the website was a place of public accommodation because the website qualifies as a "place of exhibition and

entertainment," "place of recreation," "sales or rental establishment," and "service establishment" as enumerated by the ADA. *Id.* at 200.

In response, Netflix filed a motion for judgment on the pleadings arguing the plaintiff failed to state a cause of action under the ADA because Netflix's "Watch Instantly" website was not a place of public accommodation. *Id.* Netflix argued its online streaming service was not a public accommodation because "every specific example of a public accommodation in the ADA refers to a public arena that involves people outside of the home." *Id.* at 201. Using the doctrine of *ejusdem generis*, Netflix argued that according to the ADA's language, all "public accommodations" must be accessed outside of a private residence. *Id.*

The district court rejected Netflix's application of *ejusdem generis* outright and found its interpretation of the ADA's plain language to be "unpersuasive." *Id.* In looking at the plain language of the statute, the district court noted the ADA covered the services ***"of"*** a public accommodation and not services ***"in"*** a public accommodation. *Id.* (citing 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations *of* any place of public accommodation. . ."); *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 953 (N.D. Cal. 2006) ("The statute applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation. To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute.") (emphasis added). This linguistic distinction was crucial, because under Netflix's reading of the ADA, many businesses that provided services to a customer's home – such as plumbers, pizza delivery services, or moving companies would be exempt from the ADA. *Id.* The court rationalized that while the home itself is not a place of

public accommodation, entities that provided services in the home through the internet, such as Netflix, could qualify as places of public accommodation. The court held Netflix's streaming service was a public accommodation because its service fell into the same category of services provided by a "place of exhibition and entertainment," "place of recreation," "sales or rental establishment" and "service establishment," which are all enumerated by 42 U.S.C.S. § 12181(7). *Id.* at 200. *See Carparts Distrib. Ctr. v. Auto. Wholesaler's Ass'n,* 37 F.3d 12, 19 (1st Cir. 1994) (holding the ADA's definition of "public accommodation" is not limited to actual physical structures because it would be irrational for the ADA to only protect an individual who physically enters an office to purchase services, but not to an individual who purchases the same services over the telephone or by mail).

Similarly, in *Nat'l Fedn. of the Blind v. Scribd Inc*., 97 F. Supp. 3d 565, 567 (D. Vt. 2015)*,* the plaintiff filed a complaint alleging a violation of the ADA against Scribd, Inc., ("Scribd"), a digital library operating reading subscription services on its websites and mobile apps. The plaintiff alleged Scribd's website and apps were incompatible with reader software and denied blind persons' access to Scribd's services, privileges and advantages. *Id.* In response, Scribd moved to dismiss, and argued its website and mobile apps were not places of public accommodation because the ADA did not apply to website operators whose goods or services were not made available at a physical location open to the public. *Id.*

In denying the motion to dismiss, the court rejected Scribd's arguments that Congress's use of the phrase "***place*** of public accommodation" and the doctrine of *ejusdem generis* show that a public accommodation is defined exclusively as a physical space. *Id.* at 572. The court looked at the language of the ADA as written in 42 U.S.C. § 12181(7), which enumerates the categories of public accommodations covered by the statute. The court noted 42 U.S.C. §

18

12181(7) is entitled, "Public Accommodation" and not "Places of Public Accommodation," and refers to private entities as "public accommodations" and not "places of public accommodation." *Id.* (emphasis added). As such, the ADA's failure to refer to public accommodations as "places" of public accommodation in these two instances suggested to the court that accommodations protected by the statute "must be available to the public, ***but not necessarily at a physical place open to the public***." *Id.*

The *Scribd* court further recognized that when referring to the examples of enumerated public accommodations, the ADA does not always use the word "place," but instead uses the word "establishment." *Id.* (citing 42 U.S.C. § 12181(7)(B) ("other establishment serving food or drink"); *id.* § 12181(7)(E) ("other sales or rental establishment"); *id* § 12181(7)(F) ("other service establishment"); *id.* § 12181(7)(K)("other social service center establishment")). This suggested to the court that Congress likely used the word "place" because there was "no other less cumbersome way" to describe businesses offering those particular goods or services to the public. *Id.* (citing 42 U.S.C. § 12181(7)(D) ("other place of public gathering, not public place of gathering"); *id.* § 12181(7)(H) ("other place of public display or collection, not other public place of display or collection")). Thus, this order of words suggested to the court that the defining characteristic of a public accommodation was not its "place" or location, but whether the service it provided falls into the categories enumerated in 42 U.S.C. § 12181(7)[6]. *Id.*

---

[6] The *Scribd* court noted that "travel service" was enumerated as an example of a service establishment, which is covered by the ADA. *Id.* (citing 42 U.S.C. § 12181(7)(F)). The court recognized that in 1990, the year of the ADA's enactment, it was entirely plausible that a travel service might operate with no physical location open to the public, and instead conduct all of its business by phone or mail. *Id.* The court found that requiring a physical structure or "some connection to a physical threshold" in order for the ADA to apply would result in arbitrary treatment, and that it would be illogical for the ADA to not cover a customer who bought insurance from a salesman selling policies door to door, but cover a customer who purchased the same policy in the company's office. *Id.* Accordingly, the court determined Congress did not intend for such inconsistent application of the ADA and held that Scribd qualified as a public accommodation because the services Scribd offered fell within the majority of categories of public

19

Further, the Supreme Court cautions against the limited reading employed by *Access Now* and instructs courts not to "woodenly apply limited principles every time Congress includes a specific example along with a general phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (rejecting application of a limiting principle to interpret a statute) (citing *Harrison v. Ppg Indus.*, 446 U.S. 578, 589 (1980) ("rejecting an argument that *ejusdem generis* must apply when a broad interpretation of the clause could render the specific enumerations unnecessary")). Application of a narrowing principle such as *ejusdem generis* is especially improper where, as here, the district court is required to "liberally construe" the categories enumerated in 42 U.S.C. § 12181(7) as mandated by the Supreme Court's decision in *PGA Tour, Inc.* *PGA Tour, Inc.*, 532 U.S. at 676-77 (the list of public accommodations "***should be construed liberally***" to afford people with disabilities equal access to the wide variety of establishments available to the non-disabled); *Netflix,* 869 F. Supp. 2d at 201*;* (noting the ADA should be construed broadly and rejecting defendant's application of *ejusdem generis* to 42 U.S.C. § 12181(7)); *Scribd,* 97 F. Supp. 3d at 572-74 (same). Instead, the dispositive factor in construing a statute such as the ADA is Congress's intent in enacting the statute. *United States v. Alpers*, 338 U.S. 680, 682 (1950) (instructing that the rule of *ejusdem generis* cannot be employed to "obscure and defeat the intent and purpose of Congress"); *United States v. Kennedy*, 233 F.3d 157, 161 n.4 (2d Cir. 2000) ("We note that *ejusdem generis* is only an aid in getting the meaning and does not warrant confining the operations of a statute within narrower limits than were intended.")).

---

accommodation enumerated by the ADA such as "library" or "gallery." *Id.* at 576; *See Straw v. ABA*, U.S. Dist. LEXIS 16296, at *19 (N.D. Ill. 2015) ("that the Bar Association may not offer its services at a "physical site," such as a store, does not mean that it cannot be a public accommodation for purposes of the ADA"); *see also Morgan v. Joint Admin. Bd.*, 268 F.3d 456, 459 (7th Cir. 2001) ("The defendant asks us to interpret "public accommodation" literally, as denoting a physical site, such as a store or a hotel, but we have already rejected that interpretation. An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store").

Based on the plain language of the ADA, the Website is a public accommodation because it is a private entity that provides services, which fall into the categories enumerated in 42 U.S.C.S. § 12181(7). First, the evidence adduced at trial established that the Website permits its patrons to manage and refill their pharmacy prescriptions online. The Website provides the services of a "brick and mortar" pharmacy by enabling customers to manage and refill their prescriptions online, the Website is therefore a public accommodation whose provision of services is protected by the ADA. *See* 42 U.S.C. § 12181(7)(F) (enumerating "pharmacy" as a public accommodation). The Website also qualifies as a "service establishment," which is also enumerated as a public accommodation pursuant to 42 U.S.C. § 12181(7)(F). The Website not only enables patrons to fill and refill prescriptions, but also enables patrons to locate Winn-Dixie's physical stores, and obtain information, cooking recipes and tips regarding products sold at Winn-Dixie's physical stores. [D.E. 1, ¶¶ 19, 21].

After considering all of the evidence in this matter, because the Website provides many of the services provided by Winn-Dixie's grocery stores and in-store pharmacies, it is a place of public accommodation.

> b.  **Congress Intended the ADA to Be Responsive to Changes in Technology - Especially with Respect to Available Accommodations.**

Plaintiff also presented evidence which showed Congress intended the ADA to be responsive to changes in technology especially with respect to available accommodations. While web-based services did not exist when the ADA was passed in 1990, and could not have been explicitly included in the Act, the ADA's legislative history makes clear Congress intended the ADA to adapt to changes in technology – such as the technology afforded through websites, the internet and e-commerce. Congress has stated that "the types of accommodation and services

provided to individuals with disabilities. . . *should keep pace with the rapidly changing technology of the times.*" *Netflix,* 869 F. Supp. 2d at 200 (citing H.R. Rep. 101-485(II), at 108 (1990)); *Scribd,* 97 F. Supp. 3d at 574 (same) (emphasis added). For example, Congress identified "information exchange" - the principal function of a website - as an important area of concern where expanding technology would be subject to the ADA. *Scribd,* 97 F. Supp. 3d at 574 (citing H.R. Rep. 101-485(II), at 108 (1990)). Thus, as stated by Representative Nadler when the ADA was enacted in 1990:

> Despite Congress' great cognitive powers, it could not have foreseen these advances in technology, which are now an integral part of our daily lives. *Yet Congress understood that the world around us would change and believed that the nondiscrimination mandate contained in the ADA should be broad and flexible enough to keep pace.*

*Scribd,* 97 F. Supp. 3d at 574 (citing *Achieving the Promises of the Americans with Disabilities Act in the Digital Age -- Current Issues, Challenges and Opportunities: Hearing before the H. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the House Comm. on the Judiciary,* 111th Cong., 2d Sess. 111-95 (2010)). As such, while Congress could not predict specific advances, it is obvious technology would progress in some manner and thus Congress intended for the ADA to cover new means of access.[7]

Furthermore, the legislative history of the definition of "public accommodation" shows that Congress wanted the list of 12 exemplars enumerated in 42 U.S.C. § 12181(7) to be "construed liberally" in harmony with the ADA's broad purpose. *Netflix,* 869 F. Supp. 2d at 200 (citing S. Rep. No. 116, at 59 (1990) (("[W]ithin each of these categories, the legislation only lists a few examples and then, in most cases, adds the phrase 'other similar' entities. *The*

---

[7] Over a decade before the enactment of the ADA, the Supreme Court noted in applying the Rehabilitation Act of 1973 that "[i]t is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. Technological advances can be expected to enhance opportunities. . . ." *Se. Cmty. Coll. V. Davis,* 442 U.S. 397, 412 (1979).

*Committee intends that the 'other similar' terminology should be construed liberally* consistent with the intent of the legislation that people with disabilities should have equal access to the array of establishments that are available to others who do not currently have disabilities."). *Scribd,* 97 F. Supp. 3d at 572-73 (same) (emphasis added). Congress intended the defining characteristic of public accommodations be that they offer goods or services to the public, not that they offer goods or services to the public at a physical location. *Scribd,* 97 F. Supp. 3d at 574 (citing H.R. Rep. 101-485(III), at 54 (1990)). Therefore, a person alleging discrimination does not have to prove that the entity being charged with discrimination is similar to the examples of the specific private entities enumerated in 42 U.S.C. § 12181(7). *Id.* Rather, what matters is that the entity provides a service or a good, which enables it to fall into one of the general ***categories*** of entities enumerated by subsection 7. *Id.* (citing S. Rep. 101-116, at 54 (1990)) ("Similarly, although not expressly mentioned, bookstores, video stores, stationary stores, pet stores, computer stores, and other stores that *offer merchandise for sale or rent* are included as retail sales establishments.") (emphasis supplied); *Netflix,* 869 F. Supp. 2d at 200 (citing H.R. Rep. No. 485 (III), at 54 (1990)) ("A person alleging discrimination does not have to prove the entity being charged with discrimination is similar to the examples listed in the definition. Rather, the person must show the entity falls within the overall category.").

Congress enacted Title III of the ADA to protect people with disabilities; whether they encounter discrimination in services offered by a public accommodation in person, through the mail, over the phone, via the Internet, or through some other medium to come next in the evolution of technology. Congress specifically reasoned that the defining feature of a "public accommodation" is the service offered and not the location of the service offered. Here, adoption of Winn Dixie's interpretation of the ADA would contradict Congress's purpose in enacting the

statute by relegating it to only physical locations, thus preventing the statute from adapting to technological changes as Congress intended. As stated *supra*, the Website's services such as its online pharmacy feature and coupon-printing feature are readily classified in the categories of services listed in the ADA's definition of "public accommodations."

Consistent with this view, the Court finds the congressional intent and legislative history in enacting the ADA persuasive.

### c.       The DOJ Has Interpreted Title III of the ADA to apply to Websites.

This Court gives deference to the DOJ's consistent interpretation that Title III of the ADA applies to websites and mobile apps.

In *Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40 (1944), the Supreme Court opined that an agency administrator's determinations are entitled to some respect because they are "made in pursuance of official duty, and based upon more specialized experience and broader investigations and information than is likely to come to a judge in a particular case." *See also United States v. Mead Corp.,* 553 U.S. 218, 234 (2001) (holding an agency's interpretation of a statute may merit some deference given the "specialized experience and broader investigations and information" available to the agency); *Scribd*, 97 F. Supp. 3d at 575 ("Given the DOJ's body of experience, the Court will give some deference to its conclusion that the ADA applies to websites covered by one of the categories in the statute.").

The DOJ has consistently told courts, members of Congress, and businesses that Title III applies to websites and services provided over the Internet. *Scribd*, 97 F. Supp. 3d at 574 (citing Letter from Deval L. Patrick, Assistant Att'y Gen., to Senator Tom Harkin (Sept. 9, 1996) ("Covered entities under the ADA are required to provide effective communication, regardless of whether they generally communicate through print media, audio media, or computerized media

such as the Internet."); 106th Cong., 2d Sess. 65-010 (2000)) ("It is the opinion of the Department of Justice currently that the accessibility requirements of the Americans with Disabilities Act already apply to private Internet Web sites and services."); 75 Fed. Reg. 43460-01 (July 6, 2010) ("The Department believes that title III reaches the Web sites of entities that provide goods or services that fall within the 12 categories of 'public accommodations,' as defined by the statute and regulations.")). In addition, the DOJ is currently in the process of promulgating regulations that would codify the position it has taken to establish the requirements for making websites accessible. *Id.* at 574-75 (citing 75 Fed. Reg. 43460-01)).

Upon the review of all the evidence, the Court finds the DOJ's interpretation that Title III of the ADA applies to websites and mobile apps to be persuasive and accurate under these circumstances.

### 2.      *The Website Has a Nexus with Winn-Dixie's Physical Stores.*

The Website is also subject to the ADA because it has a nexus with Winn-Dixie's physical stores.

Courts are split on whether the ADA limits places of public accommodation to physical spaces. Courts in the First, Second, and Seventh Circuits have found that the ADA can apply to a website independent of any connection between the website and a physical place. *See, e.g.*, *Morgan v. Joint Admin. Bd., Retirement Plan of the Pillsbury, Co.*, *and others*, 268 F.3d 456, 459 (7th Cir. 2001) (citations omitted) (stating that "An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store. . . The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services."); *Nat'l Fed'n of the Blind v. Scribd Inc.,* 97 F.Supp.3d 565, 576 (D. Vt. 2015) (holding that Scribd's

website, which allows consumers to access a digital library for a monthly fee, is a place of public accommodation even though it is not associated with any physical location); *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F.Supp.2d 196, 200-02 (D. Mass. 2012) (concluding that Netflix's on-demand service website is a place of public accommodation even though its services are accessed exclusively in the home). Courts in these circuits have typically looked at Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages available indiscriminately to other members of the public, and at the legislative history of the ADA, which indicates that Congress intended the ADA to adapt to changes in technology. *See, e.g.*, *Scribd Inc.*, 97 F.Supp.3d at 574-6; *Netflix, Inc.*, 869 F. Supp. 2d at 200-01.

On the other hand, courts in the Third, Sixth, and Ninth Circuits have concluded that places of public accommodation must be physical places, and that goods and services provided by a public accommodation must have a sufficient nexus to a physical place in order to be covered by the ADA. *See, e.g.*, *Earll v. Ebay, Inc.*, 599 Fed. App'x. 695, 696 (9th Cir. 2015) (the term "place of public accommodation" requires some connection between the good or service alleged to be discriminatory and a physical place); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 614 (3rd Cir. 1998) (finding that the term public accommodation does not refer to non-physical access); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010-11 (6th Cir. 1997) (stating that a public accommodation is a physical place). Courts in these circuits have concluded that a public accommodation must be a physical place because the twelve enumerated categories of public accommodations in the statute are all physical places. *See, e.g.*, *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000); *Parker*, 121 F.3d at 1010-11; *Ford*, 145 F.3d at 612-13.

The Eleventh Circuit has not addressed whether websites are public accommodations for purposes of the ADA. However, the Eleventh Circuit's decision in *Rendon v. Valleycrest Prods., Inc.* offers some guidance. 249 F.3d 1279 (11th Cir. 2002). The *Rendon* Court noted that the plain language of Title III of the ADA covers both tangible, physical barriers that prevent a disabled person from accessing a public accommodation, as well as "intangible barriers, such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the   defendant entity's goods, services and privileges. . ." 249 F.3d at 1283 (citations omitted).

*Rendon* involved an automated telephone answering system used by the television show "Who Wants to Be a Millionaire" to select contestants to appear on the program. *Id.* at 1280. The *Rendon* Court held that the plaintiffs stated a valid claim under the ADA because the plaintiffs alleged that the inaccessibility of the automated system to persons with hearing and upper-body mobility impairments effectively denied them access to a privilege (competing in the television show) offered by a public accommodation (the television studio). *Id.*  at 1284-86 (noting that the plaintiffs "seek the privilege of competing in a contest held in a concrete space. . .").

District courts within the Eleventh Circuit that have considered the question of whether websites are public accommodations have uniformly held that the ADA does not apply to a website that is wholly unconnected to a physical location. *Gomez v. Bang & Olufsen Am., Inc.*, No. 16-23801, at 8 (S.D. Fla. Feb. 2, 2017) (Lenard, J.) (holding that a website that is wholly unconnected to a physical location is generally not a place of public accommodation under the ADA); *Access Now, Inc. v. Southwest Airlines, Co.*, 227 F.2d 1312, 1321 (S.D. Fla. 2002) (Seitz, J.) (dismissing complaint because the plaintiffs failed to establish a nexus between the defendant's website and a physical, concrete place of public accommodation); *Kidwell v. Florida*

*Comm'n on Human Relations*, No. 16-403, 2017 WL 176897, at *4 (M.D. Fla. Jan. 17, 2017) (holding that a website is not a public accommodation under the ADA). However, district courts in the Eleventh Circuit have found that websites are subject to the ADA if a plaintiff can establish a nexus between the website and the physical premises of a public accommodation. *Gomez v. Bang & Olufsen Am., Inc.*, No. 16-23801 at 9 (citing *Rendon* for the proposition that if a plaintiff establishes some nexus between the website and the physical place of public accommodation, the plaintiff's ADA claim can survive a motion to dismiss); *Gomez v. J. Lindeberg USA, LLC*, No. 16-22966, at 2-3 (S.D. Fla. Oct. 17, 2016) (Williams, J.) (order granting default judgment in part) (finding that plaintiff stated a claim under the ADA by alleging that the inaccessibility of the defendant's website prevented him from purchasing the defendant's clothing online and searching for physical store locations); *Access Now*, 227 F.2d at 1320. Indeed, this concept has support in *Rendon.* There, the Eleventh Circuit noted that some courts require a nexus between the challenged service and the premises of the public accommodation, and that the plaintiffs in that matter demonstrated such a nexus. 249 F.3d at 1284 n.8.

The Court finds Plaintiff demonstrated an adequate nexus between the Website and Winn-Dixie's physical grocery stores and pharmacies. The Court rejects Winn-Dixie's argument that Plaintiff has not claimed that the inaccessibility of the website prevented him from visiting a Winn-Dixie store or pharmacy. [Mot. for J. on the Pleadings at 7-8, ECF No. 15]. At trial, Winn-Dixie relied upon *Rendon* in support of this argument. However, the *Rendon* Court noted that the ADA bars "intangible barriers. . . that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges. . ." 249 F.3d at 1283  (citations omitted). In *Rendon*, the issue was not that the inaccessibility of the automated phone system prevented the plaintiffs from

physically accessing the television studio, but rather that the inaccessibility of the phone system prevented the plaintiffs from accessing a privilege (the opportunity to be a contestant on the television show) afforded by the television studio.

In a case remarkably similar to this one, the Northern District of California denied the defendant's motion to dismiss a complaint alleging that Target Corp.'s ("Target") website failed to comply with the ADA. *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F.Supp.2d 946, 949 (N.D. Cal. 2006). The plaintiff alleged that Target's website (which was inaccessible to blind individuals) allowed customers to perform functions related to Target stores, such as access information about store locations and hours, refill prescriptions, and order photo prints for pick-up at a store. *Id.* The *Target Corp.* court noted that in *Rendon*, even though the plaintiffs did not contest the actual physical barriers of the studio, the Eleventh Circuit found that the ADA was implicated because the plaintiffs were deprived of the opportunity to compete to be a contestant on the television show. *Id.* at 955 (citations omitted). The *Target Corp.* court further noted that the statutory language of the ADA "applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation," and concluded that Target's website was "heavily integrated with the brick-and-mortar stores and operates in many ways as a gateway to the stores." *Target Corp.*, 452 F.Supp.2d at 953, 955 (emphasis added) (citations omitted).

In *Gomez v. J. Lindeberg, Inc.*, Judge Williams cited to *Target Corp.* in finding that a plaintiff stated a claim that the defendant's website violated the ADA because the plaintiff alleged that the website was inaccessible to blind individuals and allowed customers to purchase the defendant's clothing online and search for physical store locations. *Gomez v. J. Lindeberg, Inc.*, No. 16- 22966 at 3. Similarly, here the Plaintiff has demonstrated that the inaccessibility of Winn-Dixie's website has denied blind individuals the ability to enjoy the services, privileges,

and advantages of Winn-Dixie's stores. At trial, Gil testified that, among other things, Winn-Dixie's website allows customers to locate physical Winn-Dixie store locations and fill and refill prescriptions for in-store pick-up or delivery. [*See* Compl. ¶¶ 17, 19, ECF No. 1]. The Court finds that just as in *Target Corp.*, Winn-Dixie's website is heavily integrated with, and in many ways operates as a gateway to, Winn-Dixie's physical store locations. Thus, the Court finds the Website's inaccessibility denies the Plaintiff equal access to the services, privileges, and advantages of Winn-Dixie's physical stores and pharmacies.

Accordingly, the Court finds that the Plaintiff has demonstrated a nexus between Winn-Dixie's website and its physical stores such that the inaccessibility of the Website impedes the full and equal enjoyment of the Winn-Dixie physical locations.

## C.    Winn-Dixie's Website Has Accessibility Barriers Relating to Plaintiff's Disability That Violate the ADA.

Based on the evidence presented at trial, as set forth above, this Court finds that Winn-Dixie's Website is in violation of the requirements of the ADA.  Winn-Dixie has violated the ADA because the Website is inaccessible to visually impaired disabled individuals, including Gil.  As discussed, Gil is a customer of Winn-Dixie's grocery and pharmacy stores and desires to re-fill his pharmacy prescriptions through the Website's online prescription re-fill service and obtain information regarding Winn-Dixie's in-store products. During June and July of 2016, Gil attempted to utilize the Website to obtain information regarding Winn-Dixie's in-store products and access Winn-Dixie's on-line pharmacy services. Due to Gil's disability, he must use a commercially available screen-reader software to access information and services available on any web page including the Website. [Compl. ¶¶23-24, ECF No. 1].

The unrebutted expert testimony of Plaintiff's ADA Accessibility expert established that the WCAG 2.0 Guidelines require functionality with screen readers that convert the visual

interface into synthesized speech. As Plaintiff's expert indicated, the Website in its current form is simply not accessible by visually impaired individuals who use screen reader software. The Website did not integrate with Gil's screen-reader software nor contain any function for Gil to comprehend the website through other means and thus Gil could not access the Website [*Id.* ¶¶27].

The Website violates the basic effective communication mandate of the ADA and Winn-Dixie presents no evidence to establish that it would be unduly burdensome to make the information on its website accessible – or that it has even considered this question.  Nor has Winn-Dixie established that it is not readily-achievable to make its Website compliant with the ADA in order to permit visually impaired users to utilize the Website.

Thus, the Court finds Winn-Dixie's Website violates the accessibility requirements of the ADA and Winn-Dixie has failed to provide services necessary to ensure equal access to Winn-Dixie's Website.

## D.     Injunctive Relief Is Appropriate.

Title III of the ADA creates a private right of action in individuals with disabilities for injunctive relief to redress violations of Title III. 42 U.S.C. § 12188(a)(1). In the ADA context, "a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered 'actual injury.' Similarly, a plaintiff who is threatened with harm in the future because of existing or imminently threatened non-compliance with the ADA suffers 'imminent injury.'" *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002); *accord Gomez v. Dade Cty. Fed. Credit Union*, 610 F. App'x 859, 863 (11th Cir. 2015) ("In Title III cases, plaintiff must prove he is likely to suffer discrimination in the future, either because he intends to return to a noncompliant establishment,

or because defendant's misconduct deterred his patronage."); *Hagler v. Swami I Hosp. Corp.*, No. 1:15-CV-2144-RWS, 2016 U.S. Dist. LEXIS 21414, at *3-4 (N.D. Ga. Feb. 23, 2016).

As stated above, the evidence adduced at trial demonstrated that the current version of the Website is not accessible by Gil, a legally blind individual.

The Court has carefully reviewed the record evidence and finds Gil has proven that he is entitled to injunctive relief. *See* 42 U.S.C. § 12188(a)(1). The Court finds that Plaintiff demonstrated a "real and immediate threat that the plaintiff will be wronged again." *City of Los Angeles v. Lyon*s, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983). The Court also finds that Gil does not have an adequate remedy at law, and that an injunction will not disserve the public interest. As discussed above, when Gil attempted to access Winn-Dixie's website, the website did not integrate with his screen reader software, nor was there any function within the website to permit access for the visually impaired through other means. Thus, due to the Website's inaccessibility, Winn-Dixie has not provided full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations provided by and through the Website.

Accordingly, remediation measures in conformity with the WCAG 2.0 Guidelines will provide Plaintiff and other legally blind consumers the ability to access Winn-Dixie's website and permit full and equal enjoyment of the services, facilities, privilege, advantages, and accommodations provided by and through the Website.

The Court finds injunctive relief would improve access to Winn-Dixie's website by visually impaired users such as Plaintiff. Accordingly, pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff's requested injunctive relief, and hereby Orders Winn-Dixie to implement remediation measures to bring the Website in conformity with the WCAG 2.0 Guidelines within 180 days from the date of this Order, as follows:

a. Winn-Dixie shall perform a complete audit

b. Remediate the accessibility issues identified in the Winn-Dixie – Accessibility Issue List spreadsheet;

c. Adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of the Website a statement as to Winn-Dixie's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through its website;

d. Display the universal disabled logo[9] within its website, wherein the logo would lead to a page which would state Winn-Dixie Stores, Inc.'s accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the Website;

e. Provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to insure compliance thereto; and

f. Cease and desist discriminatory practices and if necessary to cease and desist operations of the Website until the requisite modifications are made such that its website becomes equally accessible to persons with disabilities.

The Court reserves jurisdiction to enforce the terms of this Order, and to address any motions for attorney's fees and costs.

Dated: March 31, 2017

Respectfully submitted,

*/s/Scott Dinin*
Scott R. Dinin, Esq.
Fla. Bar No. 97780
SCOTT R. DININ, P.A.
4300 NW 7th Avenue
Miami, Florida 33127
Telephone: (786) 431-1333
Facsimile: (786) 513-7700
E-mail: inbox@dininlaw.com
Attorney for Plaintiff

-and-

*/s/ Richard F. Della Fera*
Richard F. Della Fera, Esq.
Fla. Bar No. 066710
ENTIN & DELLA FERA, P.A.
633 S. Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 761-7201
Facsimile: (954) 764-2443
Email: Richard@entinlaw.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 31st day of March, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached service list in the manner specified either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing

/s/Scott Dinin

34

<u>**SERVICE LIST**</u>

*JUAN CARLOS GIL vs. WINN-DIXIE STORES, INC.*
**CASE NO: 1:16-cv-23020-RNS**
**United States District Court, Southern District of Florida**

Susan V. Warner, Esq.
NELSON MULLINS RILEY &
SCARBOROUGH, LLP
50 N. Laura Street, 41st Floor
Jacksonville, Florida 32205
Tel: (904) 665-3600
Fax: (904) 665-3699
Email: Susan.warner@nelsonmullins.com
 Attorney for Defendant
*Via CM/ECF Notice of Electronic Filing*